There are only two facts about the Trump administration's plans for Fannie Mae and Freddie Mac that the Court needs to recognize to see why the District Court was wrong to dismiss this case at the pleading stage. The first is that if President Trump had taken control of FHFA at the start of his administration, the administration would have held a public offering for new properties. Indeed, it would have been necessary to eliminate the liquidation preference on Treasury senior preferred stock. Let me unpack why we've plausibly alleged both of those two key facts in this case. First, if the Court looks at paragraph 84 of the complaint, we document statement after statement by Director Calabria, where Director Calabria says in late 2019 and into 2020 that he anticipated that Fannie and Freddie would be able to do a new stock issuance in 2021. If the Trump administration had been able to take control of the FHFA at the beginning of President Trump's term in office, then that process for positioning the companies to issue new stock would have been able to begin two years earlier. Counsel, that's in the new administration, right? You said 2021? Have I got my years right? That's correct, Your Honor. That's in the new administration and the voters said something different in the meantime. Well, what the voters said in 2016 was that they wanted President Trump to be in control of the FHFA at the beginning of his administration. My point is that if President Trump had been able to take control of this agency two years sooner, you take that 2021 estimate, you move that back two years to 2019, that's when it's realistic, it's plausible. We're here on a motion to dismiss. Oh, I misunderstood. I thought you said the process would take effect or finish in 2021. Not quite, Your Honor. My point is that it was a two and a half to three year process for once Director Calabria takes over at FHFA two years into the Trump administration. It's a two and a half to three year process to position these companies in a way that they're We're supposed to do this sort of, under the Supreme Court's decision in Collins, we're supposed to try to construct this hypothetical world where we're trying to figure out what would have happened if the President had been able to take control of this agency at the beginning of his administration as the Constitution required. In that scenario, the administration is able to undertake this series of steps that it's necessary for them to undertake in order to do the new stock issuance before President Trump's term in office ended. How do we know that the series of steps would have included getting rid of the liquidation preference? Because there's the one quote, even I think it was for members of the administration that said there's six different ways we can do this and one of them includes the liquidation preference. So that seems to undercut your argument. Well, the way we know, Your Honor, is because the Trump administration, one of its overriding policy objectives was to get these companies out of conservatorship as quickly as practicable and it couldn't responsibly do that. It couldn't responsibly release the companies from conservatorship until they were adequately capitalized. And the process of building capital organically just by reserving the profits that the companies are making year to year, that had the potential to be a multi-decade process. And so the administration wants to get more capital into these companies quickly and the only way to do that is to go into the capital markets and issue new raise capital that way. And the only way to make that new stock attractive to investors is to get rid of the liquidation preference. But doesn't, didn't the administration disagree with you to some extent because it suggests, that quote suggests, maybe I'm misreading it, that there are six different ways. One involves the liquidation preference and they could have gone different routes to recapitalize Fannie and Freddie. I think Your Honor may be referring to the September 2019 Treasury report and I guess a couple of answers on that. First, I point the court to paragraph 61 of the complaint where we deal with those other options. And the reality is they're not really alternative options but they're, most of them are additional things that the administration conceivably could have done along with a new capital, a new stock issuance and raising capital in the capital markets in this way. So if we just look at the specific alternative options that they talk about, you know, one of them is allowing the companies to retain their earnings over time. And again, that's something that the administration actually did do but it wasn't sufficient to quickly recapitalize the companies consistent with the administration's ultimate policy objectives. Another item that's issued is the potential for the junior preferred shareholders to effectively to take a haircut or to have their shares converted into common stock. That's totally, again, totally consistent with the administration also doing a new stock issuance. And then the other point I'd make, Your Honor, is that we've got paragraph 84 of the complaint where we document Director Calabria, President Trump's appointee, saying over and over again in 2019 and 2020, we're going to do a new stock issuance. We expect to do it in 2021. He said that repeatedly in 2020. And so, you know, the fact that there are other things from a policy perspective that the administration might have also been planning to do, some of which it did do, doesn't undermine the point that ultimately this was a central pillar of the administration's ultimate — Counsel, how is this appeal different from the remand in the Collins case in the Fifth Circuit? Your Honor, it's not. The factual allegations — Well, what did the Fifth Circuit get wrong that you can argue differently? Yeah. So what the Fifth Circuit got wrong is it said that because the complaint in that case did not allege that there was going to be an end of the conservatorships before the end of the Trump administration, that the claim failed. But that's not a necessary component of the claims that we brought to the Court. So just to take a hypothetical, imagine if we could prove to certainty that if the Trump administration had taken over FHFA at the beginning of the Trump administration, that it would have gotten rid of that liquidation preference. If we could just prove that to a certainty, but we couldn't demonstrate that they would have taken the further steps in addition to getting rid of the liquidation preference that would have been necessary to end the conservatorship. In that scenario, I think it's quite clear under the Supreme Court's opinion in Collins that we'd be entitled to a remedy. In other words, there's no reason that we need to prove that the administration would have taken any further steps beyond the specific action that we're saying the administration would have taken if it had been able to control FHFA from the beginning and that would have benefited the shareholders. And so that's the critical mistake that the Fifth Circuit made. And I'd just point out that, you know, if we look at the defendant's briefs to this Court in this case, we don't see them — you know, they have page after page saying that our factual allegations are implausible, but they never say that we have some burden to show that not only there would have been an elimination of liquidation preference, but the Trump administration would have taken the further step of getting the companies out of conservatorship. And so we don't see the defendants making this argument, and for good reason, because just analytically, there's no reason that we need to demonstrate that that would have happened in order to prevail on these claims and be entitled to a remedy. I — you know, but do you agree this is a but-for test? You know, some of the other circuits have put it that plainly. But-for the President's inability to remove the agency had harm occurred. I do agree with that, Your Honor. Okay. Do you have too many steps here? That's what I was getting at earlier. Do you have too many steps to have but-for causation? We don't, Your Honor, and I think a good way to think about this is it's really two steps. Okay? So the first step is we've got to show, we've got to allege plausibly at this stage of the case that but-for the unconstitutional removal restriction, there would have been a new issuance of stock. Okay? And that's plausible because I thought you had to show elimination of liquidation preference. Well, and that's the second I thought it had to be that specific. That's right. That's right, Your Honor. And that's the second step, is our allegations in the complaint, and, you know, I point the Court to paragraph 55 of the complaint where we explain why this is so, our allegation is that it's not possible to sell the amount of stock that was going to need to be sold to raise the level of capital that was needed without getting rid of liquidation preference. And the reason is very simple, which is that that liquidation preference, it effectively entitles Treasury to 100 percent of all earnings that these companies generate, 100 percent of all distributions to equity holders forever. And so no one would come in with, you know, the tens of billions of dollars that these companies needed if they were going to be behind Treasury with a liquidation preference of that size. And so that's why that liquidation preference, just as a matter of just fundamental market realities, had to be eliminated. I'd also point the Court to paragraph 81 of the complaint. We quote Director Calabria there making reference to this reality. He says, quote, given the structure of the balance sheets, he's referring to liquidation preference there, given the it will be very difficult, if not impossible, to raise outside capital. So that's Director Calabria himself recognizing this reality, recognizing that it's necessary to get rid of that liquidation preference in order to do a new stock issuance. And so those are the only two steps we really, the Court really has to do. Do you have to show a complete doing away with the liquidation preference, or could it take another form like preferred stock? I'm not sure I totally followed the question, Your Honor. Well, are there things less than the liquidation preference, a half liquidation preference? I made that up. Preferred stock is a better, more concrete way to address it. But is there something that could have been done that was not a complete removal of liquidation preference, but still made them marketable? The allegation in the complaint is that a complete elimination of liquidation preference is what was necessary. Now, if my friends on the other side, if we go back on remand and there were a factual dispute about this, and if they could show, you know, it's $190 billion liquidation preference on the Fannie stock right now, and it only would have been necessary to pay it down to 180, down to $5 billion from the $190 billion, then, you know, that might affect the kind of remedy that we got on remand. But that's not a reason to affirm dismissal of the complaint. What about the fact that this could have been accomplished by the Trump administration in a different way? The fact that Treasury could have sort of I think you could plausibly say that even Director Watt would have accepted that, because that's a, I mean, that's literally a gift. It's a freebie. But that didn't happen. And so maybe, maybe they were studying other options and trying to figure out which option was best for the administration. So two points on that, Your Honor. One, it is a bilateral contract, so we don't think this is something the Treasury could do unilaterally. The other point is that it's a mistake to focus on elimination of the liquidation preference in isolation. I would compare this to someone in bankruptcy taking a haircut. You know, a holder of security that agrees to a haircut in a bankruptcy proceeding, they don't they may not like the fact that they need to take a haircut, but taking a haircut is a way of maximizing the overall value of their security. So that's sort of what we're talking about here. So it's not that the Trump administration or anyone saw within the government getting rid of the liquidation preferences like an affirmative good in and of itself. It's just a necessary step in this process to getting where Director Calabria said over and over again he wanted to go, which was to position the company so that they could do a new stock issuance. I'd like to reserve the remainder of my time for rebuttal, if I may. Thank you, Mr. Barnes. Mr. Kederberg? Good morning, and may it please the Court. I'm Rob Kederberg for FHFA. Plaintiffs failed to plead a plausible theory that the removal restriction kept the Trump administration from wiping out the liquidation preferences. Their claims are built on layer upon layer of speculation that's contradicted by real world events, in addition to being precluded by dispositive legal bars. I'd first like to address what you just heard from my friend on the other side, that the only way to accomplish various broader goals of the former President, like ending the conservatorships, holding new stock offerings, was to wipe out the liquidation preferences. The reason, Your Honor, is why they try to lump those things together is that the Trump administration is on record saying, yes, we'd like to end the conservatorships, perhaps do a stock offering. But the one thing they were most definitely not on record as saying is, let's get rid of the liquidation preferences. How could you have a stock offering, though, with a liquidation preference? I just think if you're a shareholder, what you care about is getting paid, right, or the value of the stock. The stock would be near zero if you can't ever recover any income from the, you know, from your investment. Well, there's a few different ways, Judge Strasse. So in Treasury's September 2019 report, there were a few different options listed. One option was receivership. So receivership would be essentially hitting the reset button on the whole capital structure. That would not, that would maybe address the liquidation preferences, but it would also have a whole lot of other consequences. The other way is it's actually built into the preferred stock purchase agreements and continued in the Trump administration amendments in 2019 and 2021. And what that said is that if there is a new stock offering, the proceeds have to be used to pay down the liquidation preferences. So part of the function of the new stock offering would be to pay down Treasury's liquidation preferences, which is inconsistent with the liquidation preferences having to be eliminated in advance, which is the other side's thesis. Now, plaintiffs have the burden of plausibly alleging that the President's inability to remove FHFA Director Waddett will prevented the elimination of the facts that make plaintiff's theory plausible. In fact, the complaint is replete with references to documents and events that contradict plaintiff's theory. There's no facts that have been alleged that show that President Trump at any point had any intention of changing the status quo with respect to the liquidation preferences, nor that he expressed displeasure with anything Director Waddett did regarding the liquidation preferences. He never had his own Treasury Department, which was always under plenary control of the President, and the Treasury Department was the owner of these liquidation preferences, never had them take any steps toward giving the liquidation preferences up, engaging a dialogue with FHFA. What about the bilateral point? I didn't quite get it, but what about the bilateral point, Treasury just couldn't do it on their own? Do you hear that argument? Certainly, they might need to engage FHFA in a dialogue and have some kind of dialogue, but it's not plausible to expect that FHFA Director Watt would have resisted Treasury essentially proposing a giveaway. Let's give up our liquidation preferences. No reason to believe that Director Watt would have stood in the way of that, and the only thing in the record that actually — He has stood in the way of some of the details? Well, not in the way of giving up the liquidation preferences, and frankly, Judge Benton, there's no reason that they have offered nothing to suggest that Director Watt would have stood in the way of anything that President Trump wanted to do. The only thing that we have that actually embodies policy views of the President himself while he was President is the March 2019 Federal Housing Finance Reform Memorandum that was published in the Federal Register, and that's where the President — this is a document actually signed by President Trump where he tells Treasury about the steps that he wants Treasury to take to implement his vision about what to do with Fannie and Freddie, and there's 11 steps and nowhere in there is there anything about eliminating the them, abandoning them, converting them to common stock, and so if that was one of the — What's the closest thing to eliminating the liquidation preference in the steps you just said? What's the closest thing to it? Excuse — in the — Something has to accomplish — you heard Judge Strauss' point. Something has to about accomplish that. What in there accomplishes the same thing? Well, there's nothing in the President's March 2019 memorandum that addressed that. The President directed Treasury to study further options and in the process made clear that it was essential to protect and safeguard the value of Treasury's investment, which is totally inconsistent with eliminating these preferred stock interests, and if it was really the President's goal or the view that that had to be accomplished as an inexorable step to ending the conservatorships, it's exceedingly strange for that document over the No expression of that being an imperative. Something that needs to do — this was essentially the Trump administration's guiding charter of what he wanted Treasury to try to carry out in this area. What's more, that document gives instructions to Treasury that are the opposite of what you would expect the President to express if he had the goals that the plaintiffs subscribed to him. He — the memorandum says that the federal government has to be properly compensated for its support of Fannie and Freddie. Finally, Your Honors, when we look to the actual specific actions that the Trump administration took at times when it had plenary control over both FHFA and Treasury through having its own chosen appointees at the helm of both agencies, those actions also fly in the face of plaintiffs' theory because they provided for massive increases in the liquidation preferences. So I'm talking there about the September 2019 and January 2021 amendments to the Preferred Stock Purchase Agreements that provided for huge increases in the liquidation preferences. In fact, those preferences have gone up by over $100 billion for what they were when Director Watt left office. And that's why the plaintiffs and Collins, when they were before the Supreme Court, represented by the same counsel as plaintiffs here, they complained to the Supreme Court that those amendments by the Trump administration made it impossible for the companies to raise additional capital through the sale of stock. These amendments, they also retained and forced the contractual provision that said that if there is an offering of new stock, the proceeds have to be used to pay down the liquidation preferences. So that — that provision shows that it can't be the case that the decision-makers, President Trump's appointees, were thinking that the way it would have to work is that you'd have to eliminate the liquidation preferences in advance as a preparatory step. I'd also like to say a couple quick words about the legal bars that we believe could dispose of this case without even reaching the — the need to reach the plausibility issues. 4617F says no court may take any action. No, that doesn't apply to constitutional claims, right? Hasn't every court said that? Well, Your Honor, it applies to relief. So the statute targets relief. If the statute does not restrain or affect the exercise of its powers and functions more than the — They didn't use the word jurisdiction, though, right, counsel? The statute does not use the word jurisdiction, but it's hard to imagine something that would restrain or affect the conservator's exercise of its powers and functions more than — The court bought your argument you're making now. No, Your Honor, but — Go proceed. The plain language of the statute applies here. And secondly, there's also the Norton legal bar. So the plaintiffs are essentially challenging the failure to discreet action. It has to be legally required to take it. No time was the agency — were the agencies here legally required to wipe out the elimination — to wipe out the liquidation preferences. I'd like to save the remainder of the time for counsel for Treasury, Ms. Stapleton. I'll just take a moment to adjust the podium for her. Proceed. Thank you very much. Ms. Stapleton. Good morning. May it please the Court, Anna Stapleton on behalf of the Treasury appellees. The bottom line here is that there's no plausible allegation that any perceived limitation on the President's ability to remove the FHFA director at will caused compensable harm to plaintiffs. I'd like to just briefly highlight four categories of reasons why plaintiffs' theory of harm is undermined, three of which I think have already been discussed this morning. So the first, of course, as Judge Strauss pointed out, is this idea that Treasury could have acted on its own. Throughout the relevant period, Treasury was headed by Secretary Mnuchin, President Trump's appointee. And there's just no allegation here that Secretary Mnuchin ever tried to take steps to eliminate or reduce the liquidation preference. Second, there's no allegation that President Trump ever tried to get Director Watt to act to reduce or eliminate the liquidation preference. And again, as has already been discussed, there's just no reason to think that Director Watt would have declined any offer to gain this relief from FHFA's contractual obligations at no cost to the enterprises. Third, it bears pointing out that President Trump's own appointee, when he had the opportunity, didn't take the actions plaintiffs alleged that he wanted to take. And as Mr. Kederberg pointed out … How long was that period of time? He was in office for approximately two years, a little under two years. Is that enough time, though? I mean, the wheels of government move pretty slowly. Do you think that when you have a – the opposition says this is a multistep plan, one of which was liquidation preference. Well, two years seems like an eternity for many of us who have been in the private sector, but not so much for government. Your Honor, of course, they allege this idea of a multistep plan. I think if that were the case, if – excuse me – President Trump had wanted that plan to be carried out, you'd expect to see efforts being made during those first two years, right? So that just goes back to this idea we don't see Treasury trying to act. There's no allegation that Director Watt sort of was made an offer or was asked to negotiate and refused to do so. And then, of course, there's this fourth category of reasons, which is that plaintiffs' own allegations demonstrate that throughout the Trump administration, paramount policy interest was actually protecting Treasury's interest. So we see in the 2019 housing reform plan discussion of protecting the – excuse me – protecting the taxpayers, ensuring that Treasury was compensated for the capital that it had provided and promised to FHFA. That is completely at odds with the idea that what President Trump actually wanted to do was have Treasury sort of give up its interest unilaterally and for no compensation. So I would just say that for all four of those reasons, plaintiffs have failed to plausibly plead that President Trump sort of wanted to take this path and was actually prevented from doing so. If the Court has any further questions, I'm, of course, happy to answer them. Otherwise, we're happy to rest on our brief, and we would ask the Court to affirm. I see none. Thank you, Ms. Stapleton. Thank you. Just a few quick points in rebuttal. First, I think it's evident from the exchanges that we've heard today that what we have here is a classic factual dispute. There's a disagreement between the parties about the viability of doing a new stock issuance without getting rid of this liquidation preference that guaranteed that Treasury would get 100 percent of all of the company's profits forever. And, you know, we think we have the better of that factual dispute, but we're here on a motion to dismiss. We plausibly pleaded that it's not possible to do that stock issuance without getting rid of the liquidation preference. And so this case ought to go back to the district court for the parties to resolve those factual disputes. But you agree we can look at all these government documents that are referenced all the time, right? The government documents my friends have been referencing are referenced in the complaint, so we don't have an objection. Go ahead. There was reference to the fact that during the Trump administration the liquidation preference increased, and I want to make two points about that. One is to point to the Fifth Circuit's decision on this point, which they acknowledge that this is a, you know, they call this a point that's problematic for our side, but nevertheless they recognize that they've got to take the factual allegations and the complaint as a whole and assume that they're true for purposes of the motion to dismiss. And they set that increase to the liquidation preference to one side and say that we have plausibly pleaded on substantially similar factual allegations in that complaint as this one. We have plausibly pleaded that it wouldn't have been possible to do this capital raise without eliminating the liquidation preference. The other point I'd make is that the fact that they increased that liquidation preference is actually consistent with the overall factual narrative that we're presenting in the complaint, because all things else being equal, increasing the liquidation preference is a way for the Treasury Department potentially to get more on the back end by way of a conversion to common stock. And so for that reason as well, we don't think that that fact undermines the overall presentation we're making. Last point, with respect to the multi-step plan, I just note that one of the critical steps in that multi-step plan is a capital rule. This is an issue on which the political parties disagree. How much capital do Fannie and Freddie need before they can stand on their own feet? And so it's not surprising that when Director Calabria came in, he put to one side the proposed rule that Director Watt had and had to spend the better part of his entire two years during the Trump administration when he was at FHFA developing that new capital rule, because you need to know how much capital is needed before you can go to the capital markets and start to try to raise it. So for all those reasons, we would just urge the Court to reverse. Thank you, Mr. Barnes. The Court thanks all counsel for participation in an argument before the Court this morning. We will continue to study the briefing and render decision. Thank you. Counsel may be excused. Madam Clerk, would you call Case No. 2 for the morning, please? 23-1572, Center for Biological Diversity, et al. v. Minnesota Trappers Association, et al.